UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DONALD H ARTZ,

        Plaintiff,

v.

        Case No. 21-cv-0391-bhl

HARTFORD LIFE & ACCIDENT INS CO

        Defendant.

## ORDER AFFIRMING PLAN ADMINISTRATOR'S DECISION

    Plaintiff Donald Artz is challenging a plan administrator's denial of his claim for long-term disability benefits under an ERISA benefit plan provided through his employer, WEC Energy Group (WEC). Artz worked for WEC for more than 20 years, serving as a Senior Electric Distribution Controller. For most of his tenure, Artz suffered from multiple sclerosis (MS). When his MS symptoms worsened in 2019, Artz stopped working and applied for long-term disability benefits. The plan administrator, Defendant Hartford Life and Accident Company (Hartford), conducted an extensive review of Artz's medical situation, including materials from professionals retained by Artz and others retained by the plan administrator, and then denied Artz's claim both initially and on appeal. Hartford concluded that while Artz's MS precluded him from working the job he had at WEC, it did not prevent him from working in the same position at other companies, and thus he did not qualify for long term disability benefits under the plan's requirements. Artz now asks this Court to reverse. Because Artz has not shown that Hartford's decision was "arbitrary and capricious," Artz's challenge will be denied and judgment entered for Hartford.

## BACKGROUND

### A. Donald Artz Was a Long-Time Employee of WEC Who Suffered from MS.

    Donald Artz began working as a Senior Electric Distribution Controller at WEC in 1998. (ECF No. 31 at 1, 3.) Like other Distribution Controllers, WEC required Artz to work rotating twelve-hour shifts, one week on the day shift, followed by a week of night shifts. (ECF No. 29-1 at 25, 27.) Artz was diagnosed with MS in 2003 but nevertheless continued in his position at WEC

for more 16 years without incident. (ECF No. 31 at 1, 16.) Artz was able to do so, at least in part, because the role of Distribution Controller was a primarily sedentary position. (ECF No. 29-1 at 63.)

In the fall of 2019, Artz began experiencing worsening fatigue while working, a problem he associated with his MS. (ECF No. 29-2 at 203.) Indeed, fatigue is a well-known symptom of MS, particularly in patients, like Artz, who have a considerable history with the disease. (ECF No. 29-3 at 13.) Artz asked to change his twelve-hour work shift to an eight-hour shift, (ECF No. 29-2 at 203), but WEC denied his request. (ECF No. 29-1 at 78.)

Artz consulted medical professions to address his fatigue. On October 17, 2019, he saw his treating physician, Dr. Bhupendra Khatri, MD and complained that he found it "difficult to stay focused during a 12-hr shift."[1] (ECF No. 29-3 at 5.) After an examination, Dr. Khatri believed Artz's MS was relapsing. (*Id.* at 8.) A November 1, 2019 MRI showed "a significant lesion load due to multiple sclerosis in the brain and cervical spine." (*Id.* at 13.)

Artz ultimately stopped working at WEC on November 27, 2019. (ECF No. 29-2 at 23.) After leaving work, Artz took advantage of both Family and Medical Leave Act and "paid time off" before applying for and receiving STD benefits. (ECF No. 31 at 10.)

**B. WEC Provided a Long-Term Disability Plan Administrated by Hartford.**

As a full-time WEC employee, Artz was eligible to participate in both short-term disability (STD) and long-term disability (LTD) benefit plans. (ECF No. 29-2 at 191; ECF No. 29-3 at 233.) WEC's LTD plan was administered by the Hartford Life and Accident Company. (ECF No. 31 at 2.) Under Hartford's LTD plan, employees who become disabled within the meaning of the plan, and remain disabled for a specific period of time, can obtain monthly disability benefits. (ECF No. 29-2 at 174; ECF No. 29-3 at 261.) The process for obtaining LTD benefits includes the submission of medical records and a notice of claim to Hartford, documenting the timeline, cause, and prognosis of the claimed disability. (ECF No. 29-2 at 182–83.)

---

[1] Artz also saw four other physicians around this time period as a part of routine care: Drs. Fernandez, Jahnke, Shah, and Moretti. Dr. Edmund Fernandez, MD is Artz's family doctor. (ECF No. 29-3 at 86.) Dr. Fernandez saw Artz a few times in 2019 including in July, October, and November. (*Id.* at 90, 149, 170.) Hartford points out that Dr. Fernandez said Artz had not had any decrease in "concentration" or "motivation," but this was in reference to Artz's depression, not cognitive abilities. (*Id.* at 170.) Dr. Fernandez also saw Artz in February 2020. (ECF No. 29-3 at 197.) That visit likewise did not report any abnormal neurological exams. (*Id.* at 199.) Artz sought treatment from Dr. Renee Jahnke for urinary urgency, apparently unrelated to his MS. (*Id.* at 100–01.) Finally, Artz saw ophthalmologist Dr. Scott Moretti in August 2019 and February 2020. (*Id.* at 113, 190.) Based on a visual functional evaluation, Dr. Moretti found Artz capable of all tasks. (*Id.* at 76–77.)

The Hartford plan sets forth specific requirements for obtaining LTD benefits. To be considered disabled under the plan, a plan participant must show that he or she is not able to perform the Essential Duties of his or her occupation for a significant period of time. (ECF No. 29-3 at 274.) The Essential Duties of an occupation are ones that are substantial to the position because they are "fundamental or inherent to the occupation" and "cannot be reasonably omitted or changed." (*Id.*) An individual's ability to work the number of hours in his "regularly scheduled workweek" is an essential duty. (*Id.*) The plan is clear, however, that a participant's occupation is not the same as his actual position with his actual employer. Rather, the term refers to the participant's occupation "as it is recognized in the general workplace…[it] does not mean the specific job [y]ou are performing for a specific employer at a specific location." (*Id.* at 277.) The participant's disability must also be pervasive enough that he or she is unable to perform his or her occupation through an "Elimination Period" and for an additional 24 months during which the participant's monthly income is less than 80 percent of his or her income prior to becoming disabled. (*Id.* at 261, 274.) Then, after that time period, a participant qualifies for benefits if he or she cannot perform *any* occupation for which he is "qualified by education, training, or experience" with a similar earnings potential. (*Id.* at 274.)

**C. Hartford Denied Artz's Claim for LTD Benefits.**

Artz submitted a claim for long-term disability benefits under the Hartford plan on December 2, 2019. (ECF No. 32 at 7.) Artz later provided Hartford with a December 4, 2019 statement from Dr. Khatri opining that Artz could work only eight hours per day and only on the day (not night) shift. (ECF No. 29-2 at 212–13.) After receiving this opinion, Hartford asked WEC if it could accommodate Dr. Khatri's recommended restrictions. (ECF No. 29-1 at 79.) WEC replied that it could not. (*Id.* at 77–81.)

At the same time he was seeking LTD benefits from Hartford, Artz also attempted to secure Social Security Disability (SSD) benefits. In connection with that effort, Artz sought additional confirmation on the limits on his ability to work and consulted Dr. Al Baltrusaitis, DO, and an occupational therapist, Jodi Kitzrow. Artz provided Hartford with the assessments he received from Dr. Baltrusaitis and Kitzrow (as well as Dr. Khatri's). (*See* ECF No. 29-2 at 23.)

Dr. Baltrusaitis evaluated Artz on December 26, 2019. (ECF No. 29-3 at 53.) Dr. Baltrusaitis reported that Artz could not sit or stand for longer than half an hour intermittently for a total of one to two hours per day, could only walk less than half an hour intermittently for a total

of less than one hour per day, could never bend at the waist, and could only use his hands no more than two and a half hours day. (*Id.*) Dr. Baltrusaitis deemed these limitations permanent, finding that Artz had regressed and concluding that Artz had a "mild neurocognitive disorder" and "require[d] rest periods for cognitive rest." (*Id.*) Dr. Baltrusaitis also noted Artz had "marked" or "serious limitations" in several areas including reliability, judgment, attaining standards, working under specific instructions, and performing a variety of duties, explaining that Artz's "cognitive function worse towards end of shift, with fatigue, busy activity." (*Id.* at 55–57.) He opined that Artz's work limitations were more severe than Dr. Khatri's recommendations; according to Dr. Baltrusaitis, Artz could only work four hours per day, 20 hours per week. (*Id.* at 53.)

Occupational therapist Kitzrow conducted a ninety-minute evaluation of Artz in December 2019. She found him to have "[m]ild neurocognitive disorder" after a "SLUMS" examination. (ECF No. 29-2 at 300.) She noted that the Berg Balance Test indicated Artz's fall risk was low at the time of examination, but also reported: "[r]esearch has shown that patients with MS in a fatigued state are at increased risk of falls. This patient[']s fall risk may change based on fatigue levels as well as environmental factors such as heat and humidity." (*Id.* at 301.) Kitzrow confirmed that Artz could not safely lift ten pounds over his head but could sit for 20 minutes and stand. (*Id.* at 302.) Kitzrow explained that while "[f]atigue is a feeling of physical tiredness and lack of energy that many people experience from time to time . . . people who have medical conditions like MS experience stronger feelings of fatigue more often and with greater impact than others." (*Id.* at 302–03.) Based on Artz's self-reported fatigue of six out of a scale of ten, Kitzrow believed, like Dr. Baltrusaitis, Artz could work at most only four hours per day, 20 hours a week. (*Id.* at 303.)

After receiving and reviewing Dr. Khatri's, Dr. Baltrusaitis's, and Kitzrow's assessments, Hartford concluded they were "somewhat conflicting" and therefore referred Artz's claim to a Medical Clinical Case Manager for review. (*Id.* at 25.) The Case Manager, Paola Choute, followed up by recommending a Medical Consultant Review by independent neurologist Dr. Sherry Leitch. (*Id.*) As part of her review, Dr. Leitch spoke with Dr. Baltrusaitis. (*Id.*) In their discussions, Dr. Baltrusaitis indicated that Artz's most significant issues were his lower extremity weakness and fatigue that led to cognitive issues. (*Id.*) Dr. Baltrusaitis also reported that Artz had difficulty working his twelve-hour shifts because after eight hours, his hand dexterity and standing and walking endurance sharply dropped off. (*Id.*) He further noted that Artz had balance issues,

meaning he would not be able to "stoop, push, pull, kneel, or bend." (*Id.* at 24.) After completing her review, Dr. Leitch concluded that Artz would be able to work eight hours per day, for forty hours per week, but could not work more than eight hours consecutively and that his cognitive function would be affected by fatigue if he did work more than eight hours. (*Id.* at 25.) But Dr. Leitch also noted there was no "objective evidence" to confirm "severe cognitive abnormalities." (*Id.*) She further explained that Artz's fatigue "was consistent with the length of time [he has] had MS and the severity of the lesion load documented on the MRI[s]." (*Id.*)

After receiving Dr. Leitsch's evaluation, Choute provided the report to Artz's providers for comment. (*Id.* at 25–26.) On May 20, 2020, Dr. Khatri signed and returned a form, confirming his agreement with Dr. Leitch's assessment. (*Id.* at 200.) Dr. Baltrusaitis never responded. (ECF No. 32 at 16.)

Hartford's review also included an occupational analysis by its vocational case manager, Julie Bird. (*Id.* at 16; ECF No. 29-1 at 258–59.) Bird noted that Artz's occupation may "require squatting/stooping or walking on irregular surfaces" and his "gait impairments and risk of falling" might impact his ability to work at WEC. (ECF No. 29-1 at 259.) Therefore, under Hartford's policy, Bird "need[ed] to address whether [Artz's occupation] in the [national economy] actually requires the physical demands that [he] is not capable of." (*Id.*) Bird first likened Artz's occupation in the general workplace to a "Power-Distribution Engineer." (*Id.*) She noted that this occupation in the general workplace is sedentary and does not require "squatting, stooping, or walking on uneven surfaces" or working shifts longer than eight hours. (*Id.*; ECF No. 29-2 at 26.) Artz's duties at WEC deviated from this general description in part. At WEC, Artz's position was "primarily…sedentary work" but, unlike the way this position was generally performed in the national economy, the job at WEC did require occasional, light physical activity like bending, squatting, or stooping. (ECF No. 29-1 at 259.) Bird concluded that Artz thus could perform the duties of this position in the general economy even though he could not perform his former duties at WEC. (*Id.* at 258; ECF No. 29-2 at 26.)

On June 5, 2020, Hartford informed Artz that it had determined he was not disabled "throughout and beyond the Elimination Period" as required for an award of LTD benefits under the plan and thus his claim was being denied. (ECF No. 29-2 at 21.) In a detailed denial letter, Hartford explained that its decision was based on a review of Artz's entire file, including several assessments from his doctors, his job description as provided by WEC, and analyses of his claims

conducted by Bird, Dr. Leitch, and Choute. (*Id.* at 23.) Hartford pointed to its review of Dr. Khatri, Dr. Baltrusaitis, and Dr. Leitch's reports as supporting its determination that Artz could perform the duties of his sedentary position for eight hours a day. (*Id.* at 25–26.) It acknowledged that this precluded him continuing in the same position at WEC. But Hartford explained that to be disabled under Hartford's LTD plan, Artz had to establish that he was unable to perform his occupation as a power-distribution engineer at any company, not just WEC. (ECF No. 29-3 at 274, 277.) Hartford highlighted Bird's assessment of Artz's general occupation in the national economy, which confirmed the position did not require working shifts longer than eight hours. (ECF No. 29-2 at 26.) Hartford also noted that while WEC may require "some bending, squatting, stooping, twisting, reaching, and standing or working on uneven surfaces," this was not a requirement in the national economy. (*Id.*) Accordingly, the fact that WEC required its Distribution Engineers to work twelve-hour shifts and sometimes bend or squat did not make Artz disabled from his occupation as defined by the policy. (ECF No. 29-2 at 26; ECF No. 29-3 at 274, 277.)

### D. Upon Appeal, Hartford Determined that Its Decision to Deny Artz LTD Benefits Was Appropriate.

On November 19, 2020, Artz administratively appealed Hartford's denial. (ECF No. 29-2 at 148.) His arguments on appeal largely relied on Dr. Baltrusaitis's opinion that he could only work four hours per day. (ECF No. 29-2 at 148–51.) Although Hartford invited Artz to include additional information to support his appeal, specifically including Artz's Social Security Disability claim, (*id.* at 16), he did not submit any additional documentation. (ECF No. 32 at 18.)

In connection with the appeal, Hartford requested reviews of Artz's medical records through "an independent third-party vendor." (ECF No. 32 at 18.) That vendor then retained three doctors: Dr. Stephen Selkirk, MD, Neurology; Dr. Joseph Palermo, DO, Internal Medicine; and Dr. Michael Sugarman, PhD, Neuropsychology. (*Id.*) All three found Artz able to work eight-hour days. (*Id.* at 19–23.) They also rejected the bulk of the evidence Artz had supplied regarding his fatigue as subjective. (*Id.*) According to Dr. Selkirk, the severity of Artz's reported impairment to his gait, imbalance, and his fatigue were "not corroborated by clinical data." (ECF No. 29-2 at 131.) He also found that Artz had no "significant neurological examination abnormalities documented" to support "functional impairment." (*Id.*) Dr. Selkirk noted that the record indicated that Artz used a cane only once, (*id.*), and concluded Dr. Baltruasitis's findings were "not supported by clinical data in the medical record." (*Id.* at 132.) He further emphasized that Dr.

Khatri did not treat Artz's reported fatigue or spasticity either behaviorally or with drugs. (*Id.* at 132–33.) He therefore concluded "[f]rom a neurological perspective" that Artz could "reliably and consistently work" eight hours per day and forty hours per week. (*Id.* at 133.)

Dr. Sugarman similarly noted the absence of objective documentation of Artz's ability to focus, and characterized Artz's self-reports of mental fatigue as "highly unreliable." (*Id.* at 114.) Dr. Sugarman reported that Artz's physicians had not undertaken a comprehensive evaluation to determine cognitive impairment, and that Artz's sole piece of objective evidence, his "quite low" SLUMS test score, was simply a "screening test" and therefore "not sufficient to document cognitive impairment." (*Id.* at 115.) Dr. Sugarman also stated Dr. Baltrusaitis's findings of "marked" limitations on subjective reports were "inappropriate" because they were based on subjective findings alone. (*Id.* at 117.) Finally, Dr. Sugarman reported that the inconsistencies in recommendations did not indicate clearly anything that had changed over time about Artz's condition. (*Id.*) Dr. Sugarman stated that given his expertise, he saw no need for any limitations below a forty-hour workweek for Artz. (*Id.*)

Dr. Palermo assessed Artz's other, non-MS, diagnoses and found no subjective or objective evidence of impairment. (*Id.* at 124–25.) He also substantiated Dr. Sugarman's findings of no cognitive restrictions or limitations. (*Id.* at 124.)

All three of these doctors attempted to consult with Dr. Khatri but were unsuccessful. (*Id.* at 114, 122–23, 130.) After receiving their reports, Hartford itself also provided them to Artz and Dr. Khatri for comment. (*Id.* at 11.) Dr. Khatri responded by merely stating that he did not agree but provided no substantive feedback. (*Id.* at 73.)

After completing its administrative appeal process, Hartford upheld its denial of benefits on January 21, 2021 in another detailed denial letter. (*Id.* at 2–9.) Hartford explained that based on a review of Artz's entire medical file, along with the new evidence gathered on appeal, primarily the reports of Drs. Sugarman, Palermo, and Selkirk, the denial was being upheld. (*See id.*; ECF No. 32 at 24.) Specifically, Artz's self-reported symptoms were not enough to corroborate the severity of his symptoms to find him disabled within the plan requirements. (ECF No. 29-2 at 8.) Hartford also stated that it "considered both subjective and objective evidence" in its review, but that "the totality of the evidence [did] not corroborate a severity in the symptoms such that functional impairment [was] established." (*Id.*) Hartford also noted that although it considered

SSA's grant of disability benefits to Artz, the ERISA standard was different "in critical ways," and thus Artz's receipt of SSD benefits was not dispositive of the issue under the plan. (*Id.*)

## STANDARD OF REVIEW[2]

"A denial of benefits will be reviewed de novo unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 631 (7th Cir. 2004) (cleaned up) (citations omitted). If the "plan's language indicates with the requisite minimum clarity that a discretionary determination is envisaged, then a denial of benefits will be reviewed under an arbitrary and capricious standard." *Id.* (cleaned up). The arbitrary and capricious standard is deferential, but "it is not a rubber stamp, and [a Court] 'will not uphold a termination of benefits where there is an absence of reasoning in the record to support it.'" *Love v. Nat'l City Corp. Welfare Benefits Plan*, 574 F.3d 392, 396 (7th Cir. 2009) (quoting *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 774–75 (7th Cir. 2003)). As a result, "a 'plan administrator's decision will not be overturned absent special circumstances such as fraud or bad faith, if it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome.'" *Griffin v. AT&T Umbrella Benefit Plan No. 3*, 2020 WL 1185286, at *5 (E.D. Wis. Mar. 12, 2020) (quoting *Dragus v. Reliance Standard Life Ins. Co.*, 822 F.3d 667, 672–73 (7th Cir. 2018)).

## ANALYSIS

Artz argues that the Court should "reject" Hartford's denial of his LTD claim. (ECF No. 31.) But his briefing fails to identify specific reasons justifying a finding that the denial was arbitrary and capricious. His principal brief largely rehashes the record while highlighting that he (undisputedly) suffers from MS. Artz attacks Hartford's conclusion that he was able to perform the Essential Duties of his occupation throughout and beyond the Elimination Period as defined in the plan. (*Id.* at 10–12.) But this attack largely ignores the terms of the Hartford plan. Artz's briefing also complains that Hartford has a "serious" conflict of interest that weighs in his favor, (*id.* at 14–16), and criticizes Hartford's denial as inconsistent with his successful applications for

---

[2] The parties have filed cross-motions for summary judgment. (ECF Nos. 28 & 30.) The invocation of Fed. R. Civ. P. 56 does not fit well procedurally. This case is a merits appeal from a plan administrator's claim denial governed by ERISA, not an evaluation of undisputed facts presented by the parties. The Court acknowledges that its scheduling order provided for the filing of summary judgment motions and apologizes if that language created confusion. The Court will nevertheless address the merits of the parties' arguments using the ERISA framework, which both parties have utilized in their briefing.

Social Security and short-term disability benefits. (*Id.* at 19.) None of these criticisms is sufficient to overcome the plain terms of the plan and the deference the Court is required to give the administrator's decision. Because Artz has not shown that Hartford's decision was arbitrary and capricious, Hartford's denial of his claim must be affirmed.

I.  **Hartford's Determination that Artz Remained Capable of Performing the Essential Duties of His Occupation Was Not Arbitrary and Capricious.**

Artz offers a variety of complaints about Hartford's conclusion that he was capable of performing the Essential Duties of his occupation despite his struggles with MS. He criticizes Hartford for failing to identify or explain the Essential Duties of his position at WEC. (ECF No. 31 at 10.) He complains that Hartford fails to identify or explain these Essential Duties and how the medical evidence shows he is capable of performing them. (*Id.* at 12–13.) According to Artz, his MS prevents him from performing his job responsibilities at WEC, like "sticking around for as long as it takes to fix an unplanned outage." (*Id.* at 12.) He similarly decries Hartford's conclusion that this position at another employer would only require eight-hour workdays, insisting that utility customers "expect power 24 hours per day, 7 days per week," so any electric distribution controller "would be expected to work at any hour and however long is required" to fix an issue. (*Id.* at 4.)

Artz's many iterations of this argument fail to address the terms of Hartford's plan or the factual basis for Hartford's decision. Hartford's plan defines Artz's Occupation by reference to the national economy, *not* his actual position at WEC. (*See* ECF No. 29-3 at 277.) Thus, to be entitled to LTD benefits under the plan, Artz had to show that he was unable to work in his occupation *anywhere*, not just at WEC. And the record supports Hartford's finding that Artz could perform the requirements of a distribution controller in the national economy, even if not that specific role at WEC. Hartford's vocational expert, Bird, used several resources (the Dictionary of Occupational Titles, OASYS, and O*NET) to equate Artz's position as Electric Distribution Controller with a Power-Distribution Engineer. (ECF No. 29-1 at 259.) She explained that a Power-Distribution Engineer does not need to work shifts longer than the eight hours and, based on Dr. Leitsch's evaluation, Artz was able to work the required amount of hours for this position in the national economy. (ECF No. 29-2 at 26.) Bird also confirmed that while his position at WEC may have required occasional, light physical activity like bending, squatting, or stooping, the same position in the national economy did not. (ECF No. 29-1 at 259.) Thus, Hartford had evidentiary support for its conclusion that Artz was not disabled within the meaning of the Hartford plan.

Artz's repeated urging that Hartford's decision should be reversed because it failed to explain or address Artz's actual job duties at WEC misses the point. His eligibility for benefits under Hartford's plan does not depend on his ability to perform the Essential Duties of his actual position at WEC, but rather his Essential Duties in such a position in the general workforce. Indeed, in the midst of his disorganized complaints, Artz concedes that Hartford bases this proposition off of its vocational expert's opinion. (*See* ECF No. 29-2 at 26; ECF No. 33 at 4.) This concession defeats his contrary assertion that Hartford's decision is not based on evidence in the record. Hartford's reliance on Birds' report was not arbitrary and capricious. *See Chalmers v. Quaker Oats Co.*, 61 F.3d 1340, 1345 (7th Cir. 1995) ("If it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, we will not disturb the decision.") (internal citations omitted).

Artz similarly fails to show Hartford's denial was arbitrary and capricious in his repeated efforts to get this Court to reweigh the medical evidence. In deciding whether a plan administrator's decision was arbitrary and capricious, the explanation for denial is paramount: "bare conclusions are not a rationale." *Love*, 574 F.3d at 397 (quoting *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 693 (7th Cir. 1992)). Failure to explain to a claimant why the reviewer chose to discredit the evaluations and conclusions of certain physicians over others does not sufficiently explain a denial. *Id.* at 396. Instead, plan administrators must "address any reliable, contrary evidence submitted by the claimant." *Id.* at 397. They cannot ignore or dismiss pertinent medical evidence. *Leger v. Trib. Co. Long Term Disability Benefit Plan*, 557 F.3d 823, 834 (7th Cir. 2009). At the same time, administrators need not explain away irrelevant medical evidence or "annotate every paragraph of a thousand-page medical record." *Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 484 (7th Cir. 2009).

Hartford satisfied this standard. It explained its denial of long-term disability benefits twice: in its initial assessment, and in its assessment after Artz's administrative appeal. (ECF No. 29-2 at 2–9, 21–28.) In the initial denial, Hartford stated that it based its decision on the "policy language" and after reviewing his entire file. (*Id.* at 23.) Hartford explained that because the findings of Dr. Khatri, on the one hand, and Dr. Baltrusaitis and Occupational Therapist Kitzrow, on the other, provided "somewhat conflicting assessments of physical function," it sought independent review by Dr. Leitch. (*Id.* at 25.) Dr. Leitch concluded, based on her analysis, Artz could work eight hours per day. (*Id.*; ECF No. 29-1 at 258.) Vocational case manager Bird then

further concluded that Artz's ability to work an eight-hour workday was sufficient for him to be employed in his occupation in the national economy. (ECF No. 29-2 at 26; ECF No. 29-1 at 259.) Under the plan language, this is a valid and sufficient explanation for the claim denial. (ECF No. 29-2 at 25–26.)

Hartford also explained that Artz had a right to appeal this decision and provided detailed information regarding this right. (*Id.* at 27–28.) In denying Artz's appeal about one month later, Hartford cited its three independent experts' reports but also noted that it considered the entirety of Artz's record including "both subjective and objective evidence." (*Id.* at 2, 8.) The explanations of Drs. Selkirk, Sugarman, and Palermo's reports note that they again considered Artz's entire medical file and specifically addressed Artz's own professionals. (*Id.* at 4–6.) For example, Dr. Sugarman noted Artz's low cognitive score during his December 19, 2019 rehabilitation intake exam with Kitzrow. (*Id.* at 4.) Dr. Sugarman explained he gave little weight to this opinion because it was "just a screening test rather than a comprehensive evaluation" and therefore insufficient "to document cognitive impairment." (*Id.*) Dr. Sugarman likewise noted Dr. Baltrusaitis's indication of marked cognitive impairment in all areas but noted that Dr. Baltrusaitis's opinion had no clear foundation because "no objective evidence of impairment has been documented" and "subjectively reported complaints do not always correspond to objective deficits on testing." (*Id.* at 4–5.)

While Hartford based its decision, in part, on the lack of objective evidence of Artz's condition, contrary to Artz's suggestion, this is not an impermissible "bare conclusion[]." *See Love*, 574 F.3d at 397 (citation omitted). Where a claimant's main complaint is of fatigue, how much fatigue an individual experiences is "entirely subjective," but the degree to which that fatigue limits "functional capabilities … can be objectively measured." *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 770 (quoting *Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 322 (7th Cir. 2007)). Artz did not present *any* objective evidence of his fatigue besides Kitzrow's screening test. Nor does he point to any record of "specific tests of physical ability or endurance" being performed. *See Holstrom*, 615 F.3d at 770; *Williams*, 509 F.3d at 523. Hartford provided Artz chances to provide objective tests of his fatigue, but he did not take advantage of this opportunity and, indeed, failed to provide any additional information for Hartford's consideration. (*See* ECF No. 31 at 10; ECF No. 29-2 at 4.) His argument that "Hartford could have scheduled its own vocational testing," but "it chose not to" is not enough to carry his burden. (ECF No. 31 at 10.) Hartford provided a

reasoned explanation for its decision and why it weighed certain medical opinions over others to determine that Artz could work eight hours per day. Under the applicable standard, this was sufficient.

Artz is similarly off base legally in complaining that Hartford "belittl[es]" the severity of Artz's medical problems by cherry-picking the thousand-page record for "informational nuggets" that "justify denying benefits." (ECF No. 33 at 3.) He takes offense that Hartford noted that he cuts his grass for exercise and claims he uses a riding mower, negating any argument that Artz is well enough to exercise, let alone work. (*Id.* at 3 n.1.) He also complains that Hartford ignored that MS is a "slowly progressive" disease "characterized by disseminated patches of demyelination in the brain and spinal cord, resulting in multiple and varied neurological symptoms and signs, usually with remissions and exacerbations," meaning that any indications in his record that he was in better health were simply snapshots in time and not indicative of Artz's overall health. (ECF No. 31 at 17.) But no one disputes that Artz has MS or that it is a severe disease with significant impact on his life. But these facts do not suffice to establish Artz's eligibility for LTD benefits under the Hartford plan. And neither are a basis for this court to reweigh the evidence or overrule the plan administrator's decision. While Artz has a serious and debilitative illness, Hartford has fulfilled its obligations under ERISA by providing him with explanations of its denial of coverage. Hartford also invited Artz to provide additional information for his appeal (which he did not provide) and requested further input from Artz's treating physicians. (ECF No. 32 at 18.) Thus, contrary to Artz's characterization, Hartford's denial letters do not cherry-pick the medical record.

The record confirms that Hartford offered reasoned explanations for its denial of his LTD claim and addressed the material medical issues raised. That Artz disagrees with those explanations and conclusions does not make them arbitrary and capricious. Such explanations, expressly based on a review of Artz's entire file, are not the type of bare rationales that could remotely be called arbitrary and capricious. *See Holmstrom*, 615 F.3d at 766 ("[S]pecific reasons for denial [must] be communicated to the claimant and … the claimant [must] be afforded an opportunity for full and fair review by the administrator."). The Court therefore cannot find Hartford's review arbitrary or capricious.

II. **Any Potential Conflict of Interest Does Not Break a Tie in Artz's Favor.**

Artz also argues for reversal based on Hartford's alleged conflict of interest as plan administrator and claim adjudicator. (ECF No. 31 at 14–16.) It is true that because Hartford

controls both the evaluation and the payment of benefit claims, the Court must be wary of any potential conflicts of interest. *See Love*, 574 F.3d at 396 n.1 (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. (2008)). The Supreme Court has noted that when a plan administrator evaluates and pays benefits on claims, a conflict of interest is present. *Glenn*, 554 U.S. at 112. Plan administrators have a financial incentive to find fewer individuals disabled because they have both the discretionary authority to determine benefits and the obligation to pay those benefits. *See Holmstrom*, 615 F.3d at 766 (citing *Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 861 (7th Cir. 2009)).

But this relatively common scenario is not an independent basis for reversal of a denial decision. A conflict should be evaluated by inferring through the circumstances of the case the "gravity of the conflict, and thus the likelihood that the conflict influenced the plan administrator's decision." *Majeski*, 590 F.3d at 482 (citing *Marrs v. Motorola, Inc.*, 577 F.3d 783, 789 (7th Cir. 2009)). If one exists, a conflict of interest is weighed as a factor in determining whether a plan administrator was arbitrary and capricious and can act as a tiebreaker in close cases. *See Holmstrom*, 615 F.3d at 767; *Lacko v. United of Omaha Life Ins. Co.*, 926 F.3d 432, 440 (7th Cir. 2019). But conflicts carry less weight with evidence that a plan administrator took steps to minimize any conflicts. *Lacko*, 926 F.3d at 440. "The reasonableness of the procedures by which the plan administrator decided the claim, any safeguards the plan administrator has erected to minimize the conflict of interest, and the terms of employment of the plan administrator's staff that decides benefit claims" are all relevant circumstances of the case. *Majeski*, 590 F.3d at 482 (citing *Marrs*, 577 F.3d at 789). In particular, providing a claimant a review process, copies of the medical opinions, opportunities to respond, and also utilizing independent medical opinions is evidence that the plan administrator attempted to minimize any conflict of interest. *Dragus*, 882 F.3d at 673.

There is no evidence that Hartford's plan administrators acted impermissibly here. Artz argues that Hartford's failure to provide analysis showing why it rejected WEC's job description in determining the typical length of shifts in the national economy suggests a conflict of interest. (ECF No. 33 at 7.) But Bird's vocational analysis addressed these issues. She used resources aimed at equating Artz's WEC position to one in the national economy. And Hartford took steps to minimize conflicts by retaining third-party medical experts for Artz's administrative appeal and providing Artz with an appeals process. *See Niemuth v. EPIC Life Ins. Co.*, No. 20-cv-629-jdp,

2022 WL 17359886, at *15 (W.D. Wis. Dec. 1, 2022) ("[T]he conflict of interest is not significant here. [The company] took appropriate precautions to eliminate its conflict of interest by contracting with third party agencies who in turn referred [the plaintiff's] case to independent physicians . . . [and] provided [the plaintiff] with the opportunity to appeal . . . and . . . to respond.").

III. **Artz's Successful Application for SSD Benefits Does Not Mean Hartford's Denial of LTD Benefits Was Wrong, Let Alone Arbitrary and Capricious.**

Artz finally argues that Hartford's claim denial was arbitrary and capricious because it failed to adequately consider his grant of Social Security Disability benefits and its own conflict of interest in denying LTD benefits. (ECF No. 31 at 19.) To be sure, an administrator's failure to consider the SSA's determination in its own decisions can suggest arbitrary decision making, especially when the SSA's determination was made "under a similar or more stringent disability definition." *Holmstrom*, 615 F.3d at 773 (citing *Glenn,* 554 U.S. at 118). At the same time, the SSA's determination that a person qualified for disability benefits is not binding on employers. *Love*, 574 F.3d at 398. And sometimes a plan's definition of "disabled" is different and perhaps more stringent than the SSA's determination. *Id.*

Here, Hartford acknowledged Artz's receipt of Social Security Disability benefits but noted that "the SSA measures a condition against a unique set of federal criteria" whereas Hartford determines benefits "under a private…policy" dependent "in part on the interpretation of the specific terms in the policy." (ECF No. 29-2 at 8); *c.f. Holmstrom*, 615 F.3d at 773 ("In its denial letters, [the insurance company] never stated why it disagreed with the Social Security determination; rather, it stated only that *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003), essentially dissolved any relevance of Social Security determinations in ERISA cases."); *Lacko*, 926 F.3d at 442 ("[I]n its denial of LTD benefits [the company] did not further attempt to reconcile the SSA determination that [the plaintiff] was entitled to disability benefits, dismissing it with one statement: 'Eligibility requirements for Social Security Disability may differ from the eligibility requirements under this policy.' That trite statement is of no value in any analysis."). Hartford adequately explained why the SSA's determination was not helpful in its analysis, and it also invited Artz to submit copies of his SSA records, but Artz did not avail himself of this opportunity. (ECF No. 29-2 at 16; ECF No. 32 at 18.) Artz's receipt of Social Security disability benefits by itself cannot make Hartford's reasoning arbitrary and capricious.

Artz also complains that Hartford improperly "changed its stance" when it denied LTD benefits after having granted STD benefits under the same standard. (*See* ECF No. 31 at 10.) He

claims that when he received short term disability benefits, Hartford found him disabled under this "own occupation" standard but denied long-term disability benefits under the same standard "by ignoring or defining away the actual duties of Artz's regular occupation." (*Id.*) This argument fails because Artz provides no evidence of the disability standard that was applied for his STD benefits. Nor has he shown how or whether that undisclosed standard is related to, the same, or different from the standard for LTD benefits under Hartford's plan. As best as the Court can guess, Artz's STD benefits were payable under an entirely separate plan and presumably subject to an entirely separate eligibility standard. If the terms of the STD plan are buried somewhere in the record, Artz has not pointed to them. Absent evidence concerning the STD plan requirements, the Court is unable to speculate on whether or how the approval of STD benefits can or cannot be squared with Hartford's denial of LTD benefits. And, even if the standards were similar, a fact that could only be guessed at now, this similarity would not be dispositive. "[T]he previous payment of benefits is just one 'circumstance,' i.e., factor, to be considered in the court's review process; it does not create a presumptive burden for the plan to overcome." *Holmstrom*, 615 F.3d at 767 (quoting *Leger*, 557 F.3d at 832).

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Hartford's motion for summary judgment, ECF No. 28, is **GRANTED**. The case is dismissed. The Clerk of Court is directed to enter judgment accordingly.

**IT IS FURTHER ORDERED** that Artz's motion for summary judgment, ECF No. 30, is **DENIED**.

Dated at Milwaukee, Wisconsin on June 1, 2023.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge